UNITED STATES FIDELITY & GUAR-ANTY COMPANY and American Home Assurance, Plaintiffs,

v.

BRASPETRO OIL, et al., Defendants.

United States Fidelity & Guaranty Company and American Home Assurance, Plaintiffs,

v.

Petroleo Brasileiro S.A.—Petrobras, et al., Defendants.

Nos. 97 CIV. 6124(JGK), 98 CIV. 3099(JGK).

United States District Court, S.D. New York.

Sept. 20, 2002.

Dana B. Klinges, Dana Klinges, New York City, Andrew J. Lorin, Wolf, Block, Schorr and Solis-Cohen LLP, New York City, Neil L. Glazer, Wolf Block Schorr and Solis-Cohen, LLP, Philadelphia, PA, for U.S. Fidelity & Guar. Co., American Home Assurance Co.

Howard L. Vickery, II, Cameron & Hornbostel, LLP, New York City, Larry W. Thomas, Duncan Hume Cameron, Cameron & Hornbostel, Washington, DC, for Braspetro Oil Services Co., Petroleo Brasileiro SA Petrobras.

Steven R. Schindler, New York City, for Bank of Tokyo-Mitsubishi, Ltd., Long Term Credit Bank of Japan, Ltd.

John W. Dreste, Ernstrom & Dreste, LLP, Rochester, NY, J. Peter Coll, Jr., Jeffrey A. Conciatori, Kristen Bancroft, Orrick, Herrington & Sutcliffe, LLP, New York City, John G. Lipsett, Forsythe, Patton, Ellis, Lipsett & Savage, New York City, for Sequip Participacoes, SA, Industrias Verolme-Ishibras SA, Sade Vigesa SA, SV Engenharia SA, Sade Vigesa Corp. of America, Sade Vigesa (Chile) SA, Sade Vigesa Indust. E. Servicios, SA.

Jeffrey A. Conciatori, Orrick, Herrington & Sutcliffe, LLP, New York City, for Internacional De Engharia SA.

*OPINION AND ORDER*

KOELTL, District Judge.

The Court is entering a Judgment in accordance with the Findings of Fact and Conclusions of Law, dated July 25, 2002. In connection with the entry of that Judgment, the Court received proposed Judgments from the parties together with supporting submissions with respect to the applications for attorneys' fees and expenses including a detailed affirmation concerning the requests by Braspetro Oil Services Company ("Brasoil") and the Bank of Tokyo–Mitsubishi, Ltd. (sued herein as The Bank of Tokyo Ltd.-Japan) and Shinsei Bank Limited (successor in interest to the Long Term Credit Bank of Japan, Ltd.) (collectively the "Japanese Banks"). The Court held a hearing on August 26, 2002, and thereafter received additional submissions including detailed billing records and affirmations by all the law firms that sought attorneys' fees and costs in this case. The purpose of this Opinion and Order is to set out findings of fact and conclusions of law in connection with the issues disputed by the parties in connection with the entry of judgment, particularly the amount of the reasonable attorneys' fees and costs to be included in the Judgment and the amount of pre-judgment interest.

*Attorneys' Fees and Costs*

■ 1. The plaintiffs United States Fidelity and Guaranty Company and American Home Assurance Company (collectively the "Sureties") initially objected to any award of attorneys' fees and costs because Brasoil and the Japanese Banks had not put in any evidence at trial of the amount of the attorneys' fees and costs that had been incurred. However, the P–19 and P–31 Bonds (the "Bonds") at issue in this case provided for the recovery of "[a]dditional legal ... costs resulting from the

Contractor's Default, and resulting from the actions or failure to act of the Surety..." (S–72A; S–123.) The Court concluded in its original Conclusions of Law, familiarity with which is assumed, that "The Sureties are liable for the legal fees of this action, as provided for in the Bonds." (Conclusions of Law ("COL") ¶ 48.) It is well established that the exact amount of attorneys' fees and costs is to be decided by the Court after a finding of liability. *See McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1313(2d Cir.1993); *see also F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1261–69 (2d Cir. 1987); *Phlo Corp. v. Stevens,* No. 00 Civ. 3619, 2001 WL 1313387, at *3 (S.D.N.Y. Oct.25, 2001). This is also routinely done through the submission of detailed affidavits providing the details of billing practices, including rates and hours charged on a particular cases. *See McGuire,* 1 F.3d at 1316; *F.H. Krear & Co.,* 810 F.2d at 1261.

As the Court explained at the August 26 hearing, even if Brasoil and the Japanese Banks were required to submit evidence of the amount of fees at trial, which they were not, the Court would exercise its discretion to reopen the record of this nonjury trial because, as the Court of Appeals explained, "It would be unfair to deny that award merely because defendants had decided, based on a common practice and with no reason to do otherwise, to wait until after a verdict to submit proof of the amounts of attorneys' fees." *McGuire,* 1 F.3d at 1315–16.

2. The amount of "legal costs" recoverable under the P–19 and P–31 Bonds is to be decided in accordance with New York law. (*See* COL ¶ 8.) The Court of Appeals has explained the New York law with respect to a contractual provision for the recovery of legal costs:

As a general matter of New York law, ... when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable.... A variety of factors informs the court's determination of whether a requested amount of attorneys' fees is reasonable or unreasonable, including the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved. In general, the court uses a "lodestar" method, in which the hours reasonably spent by counsel, as determined by the Court, are multiplied by the reasonable hourly rate. The lodestar analysis is, however, tempered by a policy requiring that contractual provisions for the payment of attorneys' fees be strictly construed, and general language will not be sufficient to warrant an award for a type of expense that is not customarily reimbursed.

*F.H. Krear & Co.,* 810 F.2d at 1250(quotations and citations omitted).

3. In this case, it is useful to note at the outset that the parties agree that any award of legal costs is limited to the difference between the amount of damages already found based on the Sureties' breach of their obligations under the Bonds and the amount of the Bonds. This is because the provisions for damages that includes "legal costs" in the Bonds is limited to the amount of the Bonds. (S–72A ¶ 6; S–123 ¶ 6.) With respect to the P–19 Bond, the total damages were $90,600,000. (Findings of Fact ("FOF") ¶ 464.) The amount of the P–19 Bond was $110,532,660. (FOF ¶ 76.) Thus, the total recoverable legal costs for the P–19 Bond could not exceed $19,932,660. With respect to the P–31 Bond, the total damages were $146,201,776. (FOF ¶ 472.) The amount

of the P–31 Bond was $163,000,021. (FOF ¶ 141.) Thus, the total recoverable legal costs for the P–31 Bond could not exceed $16,798,245. The total recoverable legal costs therefore cannot exceed $36,730,905. As explained below, the total amount of legal costs actually incurred, taking into account the reasonable success fee that was contracted for, was much in excess of this amount. Moreover, whether measured by the lodestar method, or a reasonable percentage of recovery, the amount of the legal costs sought is wholly reasonable.

4. Brasoil and the Japanese Banks seek the attorneys' fees and costs for four law firms: Cameron & Hornbostel, LLP and Fox Horan & Camerini, New York law firms that represented Brasoil; Tostes, Schver & Associados Advogados, a Brazilian law firm that represented Brasoil; and Schindler, Cohen & Hochman, a New York law firm that represented the Japanese Banks. The amount of those fees and costs are detailed in sworn declarations submitted by responsible persons from each of those firms together with the contemporaneous computerized billing records and the monthly invoices. The computerized billing records reflect detailed daily time entries for each of the professionals working on the matter. The invoices were reviewed by the Petrobras defendants on an ongoing basis and paid. As Howard Vickery, the lead lawyer for Cameron & Hornbostel, LLP explained:

> The Petrobras Defendants reviewed all bills submitted by counsel, item by item, before they were paid. Mr. Claudio Uribbe Castro, an engineer, was responsible for scrutinizing each bill and verifying the accuracy of the statement.

From time to time, he and Mr. Rui Berford Dias, the General Counsel of Petrobras, questioned items on our bills and received explanations therefor. In some cases, bills were redone and resubmitted to address the client's concerns.

(Supplemental Declaration of Howard Vickery dated September 9, 2002 ("Vickery Supp. Decl.") ¶ 37.)

5. Cameron & Hornbostel, LLP and Fox, Horan & Camerini performed their services pursuant to an agreement with Petrobras whereby they charged hourly rates 20% less than their normal billing rates. In return they were entitled to receive "10% of the final recovery, less the amount of hourly fees paid to [them] since the initiation of the litigation." (Declaration of Howard Vickery ("Vickery Decl."), sworn to August 7, 2002, Ex. 5; Declaration of John Horan, sworn to September 9, 2002.) This success fee was wholly reasonable. It provided an immediate benefit to the clients by reducing the fees by 20%. It provided an incentive to the lawyers to succeed in the litigation, but the litigation was hard fought and there was no guarantee of success. Moreover, by providing for the subtraction from the success fee of any attorneys' fees already paid, there was an incentive for the attorneys to perform their work as efficiently as possible. As a result of this success fee, the lodestar in this case is artificially low because it is calculated at the attorneys' billing rates which are 20% lower than their regular billing rates.

6. The lodestar calculation for the attorneys' fees for all four law firms is $ 13,508,921.80. (Vickery Supp. Decl. Ex. 1.)[1]

---

**1.** The Supplemental Vickery declaration states that all legal fees for the period from February 28, 1997 to August 17, 1997, the period prior to the filing of the lawsuit were removed from the fee application. (Vickery Supp. Decl. n.1.) However, the original Vickery Declaration sought a total of $13,-

507.176.03 in attorneys' fees. (Vickery Decl. Ex. 1.) The Supplemental Vickery Declaration sought $13,508,921.80 as the lodestar. (Vickery Supp. Decl. Ex. 1.) The Petrobras Defendants apparently acknowledge that they cannot recover for the legal costs expended prior to the initiation of the litigation. The Court

This represents a total of 69,889.79 hours by partners, associates, law clerks, and paralegals. The hourly billing rates at the then applicable or reduced rate that were used to bill contemporaneously for the relevant lawyers were as follows:

Partners

| | |
|---|---|
| Cameron & Hornbostel, LLP | $200–$250 |
| Fox Horan & Camerini | $240 |
| Schindler, Cohen & Hochman | $290–$420 |
| Tostes, Schver & Associados Advagados | $170–$200 |

Associates

| | |
|---|---|
| Cameron & Hornbostel, LLP | $140–$170 |
| Fox Horan & Camerini | $160 |
| Schindler, Cohen & Hochman | $220–$275 |
| Tostes, Schver & Associados Advagados | $120–$140 |

Law Clerks and Paralegals

| | |
|---|---|
| Cameron & Hornbostel, LLP | $100–$125 |
| Fox Horan & Camerini | $ 75 |
| Schindler, Cohen & Hochman | $ 75–$140 |
| Tostes, Schver & Associados Advagados | $ 85–$100 |

7. There is no question that the rates were reasonable and the Sureties do not contend otherwise. Indeed, partially as a result of the reduced rates charged by Cameron & Hornbostel LLP and Fox, Horan & Camerini, the rates were significantly below the rates approved as reasonable rates in other cases in this metropolitan area, and the reported rates for other firms in this area that handle complex litigation. (*See* Vickery Supp. Decl. Ex. 5 and 6.)

8. The time spent on this litigation was also reasonable. While the number of hours is substantial, this litigation spanned approximately five years and resulted in a trial that lasted about two months. The discovery in the case was massive and the case was pursued by the Sureties with great tenacity. The Petrobras Defendants advise that they took or defended some 110 fact and Fed.R.Civ.P. 30(b)(6) depositions at various locations in the United States, Brazil and England. The parties exchanged in excess of one million pages of documents, many of which were in Portuguese. The Court is able to assess the complexity of the case from the trial as well as from the years of disputes that were resolved either by the Magistrate Judge or this Court. The record requires an understanding of complex issues of naval architecture, construction contracts, performance issues, financial and accounting issues, suretyship law, Brazilian corporate law, and many other issues.

9. The Sureties had argued that the fees should be reduced based on the amount of time spent on various issues that they argue should not be compensable under the Bonds.

■ (a) The Sureties argue that only the fees spent on the Declaratory Judgment Action and not the Indemnity Action should be reimbursable because only the Declaratory Judgment Action sought relief from the Sureties with respect to their obligations on the Bonds. The Indemnity Action sought to shift any liability from the Sureties to Petrobras. The argument is without merit. The very defenses that the Sureties used in the Declaratory Judgment Action form the basis for their claim in the Indemnity Action. In the Declaratory Judgment Action the Sureties treated Petrobras and Brasoil together and referred to them as Petrobras/Brasoil. (*See* Compl. in 97 Civ. 6124 *passim.*) In the Declaratory Judgment Action, the Sureties sought a declaration, among other things, that "Petrobras/Brasoil has acted at all relevant

will thus reduce the original fee and cost application submitted with the original Vickery Declaration by subtracting the amount of the first six invoices in the amount of $258,559 ($211,724 in fees and $46,835 in costs). Thus, the total fee and cost application without any success fee is reduced from $24,360,755 to $24,102,196. The effect of this reduction on the lodestar calculation is not material.

times as the partner and/or alter ego of IVI/Sade and IVI/Sade/IESA and has dominated and controlled each of their operational, management and financial affairs." (*Id.* at 13.) In the Indemnity Action, the Sureties argued that the same theory of partnership and joint venture liability was a basis to assert that Petrobras was liable for the activities of IVI, Sade and IESA. (*See, e.g.,* Compl. in 98 Civ. 3099, counts 6–8.) The defense of the Indemnity Action involved the same core facts and issues as the defense of the Declaratory Judgment Action. The issues in the cases were inextricably intertwined. This Court took this into account in consolidating the two cases initially for discovery and then for trial. Given the commonality of the issues, no reduction in fees is appropriate because the same time and fees would have been expended based on the allegations in the Declaratory Judgment Action even without the Indemnity Action. *See Quaratino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir. 1999); *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1183 (2d Cir.1996).

■■■ (b) The Sureties argue that the fees expended on the unsuccessful motion to dismiss in both cases and the appeals to the Court of Appeals should not be included. The Sureties point out that these motions were unsuccessful. However, it was important to establish subject matter jurisdiction in the cases. It would not have been prudent to have defended litigation for five years only to find that there was no subject matter jurisdiction. As reflected in the opinions by this Court and the Court of Appeals, the motions were not frivolous. Moreover, the opinions themselves reflect the interrelated nature of the actions. Finally, to the extent that the Sureties are simply arguing that Brasoil and the Japanese Banks should not be compensated for any unsuccessful activity they pursued in the course of obtaining ultimate success on the merits, the argument is baseless. Brasoil and the Japa-

nese Banks obtained a recovery close to the full amount of the Bonds. Success in the litigation is measured by the ultimate success and not by individual aspects of the long litigation history in the case. *See Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit."). To the extent that the Sureties are arguing that the expenses of the motion to dismiss and the appeal in the Indemnity Action are not compensable because the issues were different from those in the Declaratory Judgment Action, the issues were sufficiently intertwined so that no reduction in legal costs should be made.

(c) The Sureties argue that the amount of fees expended in successfully moving to dismiss the IVI cross-claims should not be compensable because those claims were not directly related to the issues relating to liability under the Bonds. However, the issues raised in that motion were directly related to the arguments that the Sureties raised against the Petrobras Defendants under Brazilian law. Therefore, while some issues such as the application of the forum selection clause in the underlying construction contracts were more relevant to the motion to dismiss the IVI cross-claims motion than to the claims in the Declaratory Judgment Action, many of the issues were directly related to the Brazilian law issues in the Declaratory Judgment Action. That motion was related to the core issues for which Brasoil and the Japanese Banks are entitled to recover

fees and expenses. Therefore, reimbursement for that motion is appropriate.

(d) The Sureties argue that Brasoil and the Japanese Banks are not entitled to recover for any fees or expenses related to the Marubeni state court action or the claims in the Indemnity Action for tortious interference with any agreements with Marubeni America Corporation ("MAC"). Some of the issues relating to MAC were related to the Declaratory Judgment Action because they related to the contract funds that were due to the P–19 Consortium and the degree to which Petrobras/Brasoil dominated or controlled IVI, issues that were raised in the Declaratory Judgment Action. (*See* FOF ¶¶ 434–42.) The Petrobras defendants were not parties to the Marubeni state court action and Mr. Vickery declares credibly that the amount of time spent in connection with Marubeni matters was less than 1% of the total time spent by New York counsel for the Petrobras defendants. (Vickery Supp. Decl. ¶ 24.)

(e) The Sureties argue that Brasoil cannot recover for any expenses incurred in connection with the litigation pending in Brazil. The Petrobras defendants do not dispute this assertion but contend that the amount of fees and expenses devoted to the Brazilian action was less than 1% of the time spent by Cameron & Hornbostel LLP. (Vickery Supp. Decl. ¶ 29.) This is supported by the Declaration of the Brazilian counsel for the Petrobras defendants who affirms that his firm was counsel to Brasoil and Petrobras in the Brazilian action and "the involvement of Cameron & Hornbostel was minimal." (Declaration of Sergio Tostes, dated September 6, 2002 ("Tostes Decl.") ¶ 25.)

The Sureties argue that a sampling of the Cameron & Hornbostel invoices for the months of September, 1997 and January 1999 show substantial time spent on the Brazilian litigation. (Pl. Further Obj. to Defts.' Proposed Form of Judgment at 4.) The Court's review of those same invoices does not support the Sureties' allegations that 50% of the time in those months was spent solely on the Brazilian litigation. Rather, even taking the months selected by the Sureties, which occurred before the substantial amount of the fees expended in connection with the New York litigation, it appears that less than $30,000 in fees was devoted to matters in connection with the Brazilian litigation. Moreover, the basic factual analysis that would be related to the Brazilian actions would also be relevant to the Declaratory Judgment Action.

(f) The Sureties also argue that the fees of Brazilian counsel should not be included because Brazilian counsel has segregated its fees with respect to the New York litigation, but they have not distinguished the fees in connection with the Declaratory Judgment Action and the Indemnity Action. As explained above, however, the core issues of fact and law in both litigations are inextricably intertwined and no reasonable deductions should be made, because of a failure to distinguish between the two actions.

(g) The Sureties argue that the fees of counsel for the Japanese Banks should not be reimbursed. This argument is also without merit. The Japanese Banks were co-obligees under the Dual Obligee Rider to the P–19 Bond. (S–72 A.) The Sureties recognized their potential obligation to the Japanese Banks by naming them as defendants in the Declaratory Judgment Action. The legal costs of the Japanese banks, therefore, also are part of the damages resulting from the act or failures to act by the Sureties. The fees and expenses of counsel for the Japanese Banks are also wholly reasonable and are included in the lodestar calculation.

10. The Sureties also argued that the fees in this case should not be reimbursed

because they were not actually paid by Brasoil. However, the evidence demonstrates that the fees were paid by Brasoil or charged to Brasoil because they were an obligation of Brasoil. (*See* Declaration of Marcos Antonio Silva Menezes dated September 6, 2002 ¶ ¶ 3–10.)

11. In this case, the lodestar produced the fees actually billed by the lawyers. The work was efficiently done. The overwhelming amount of the work in the case of each of the law firms was done by the lawyers principally responsible for the litigation. The total fees billed were as follows:

| | |
|---|---|
| Cameron & Hornbostel and Fox Horan | $10,000,683 |
| Tostes, Schver & Associados Advogados | $ 1,440,098 |
| Schindler, Cohen & Hochman | $ 2,066,395 |
| | $13,507,176 |

(Vickery Decl. Ex. 1.)

In determining the lodestar, the Court will subtract the fees for the initial six invoices for Cameron & Hornbostel LLP because they relate to the period before the litigation began. This amount is $211,724. (*Supra* n. 1.) In addition, the Court will make a reduction for the amount of time spent on matters relating to Marubeni and the Brazilian litigations. Based upon the Court's review of the submissions, including the Vickery Supplemental Declaration, these matters should result in deductions of no more than 4% of the fees charged by New York counsel for the Petrobras defendants, or about $400,000. Thus, the lodestar in this case is $12,895,452.

12. By any measure, the lodestar is wholly reasonable. It is less than 6% of the damages in this case without even taking into account the substantial prejudgment interest which is also recoverable. The other factors set out by the Court of Appeals in *Krear* also demonstrate the reasonableness of the fees produced by applying the lodestar. It is clear that each of the lawyers who played a significant role in the litigation was experienced and well-qualified. The case was exceedingly difficult and pursued with skill and efficiency. The fee arrangement was more favorable to the client than the fees in comparable cases.

13. Before turning to the issue of the success fee, it is necessary to address the issue of expenses. The expenses in this case were substantial because this was a multi-national litigation that involved substantial travel expenses. It also involved substantial computerization expenses to deal with the voluminous documentary discovery. It also involved substantial translation expenses because many of the documents were in Portuguese and some of the depositions and trial testimony were conducted in Portuguese with English translations. Finally, there were substantial expert fees. The Petrobras defendants spent approximately $5.9 million in expert fees for all of the experts. In the context of this litigation, all of those fees were reasonable. (*See generally* Vickery Supp. Decl. ¶ ¶ 30–36.) Indeed, the engineering expert for the Sureties testified at trial that his firm alone was paid $5 million for its services. In sum, the total expert expenses of $5,867,786.50 and the total attorneys' expenses of $4,985,792.20 were reasonable. (*See* Vickery Decl. Ex. 1.) The total expenses are therefore $10,853,579.

14. Finally, the success fee for Cameron & Hornbostle LLP and Fox Horan & Camerini was reasonable and recoverable to the limit of the Bonds. Modified success fee arrangements structured in a reasonable manner are permissible and provide a basis for recovery. *See Colli v. Wirth*, No. 94 Civ. 3234, 1996 WL 346448 (S.D.N.Y. June 24, 1996). For the reasons explained above, the success fee provided an incentive for the lawyers and insured a

reasonable cost for the clients. The total of 10% of the amount recovered, reduced by the amount of the attorneys' fees actually paid, is substantially less than straight contingent fees that have been approved in other cases. *See, e.g., In re Nasdaq Market–Makers Antitrust Litigation*, 187 F.R.D. 465, 470 (S.D.N.Y.1998) ($143 million fee award representing 14.0 percent of the common fund); *In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 912 F.Supp. 97, 104 (S.D.N.Y.1996) ($29.7 million contingency fee award representing 30 percent of recovery). In this case, the amount of the success fee that can actually be recovered as part of the Judgment against the Sureties is far less than the amount that Brasoil agreed to pay since the amount of attorneys' fees and expenses can be no greater than the difference between the amount of the damages on each Bond and the amount of the Bond. (*See supra* ¶ 3.) The total success fee for which Brasoil could be liable would be about $23.3 million. The total judgment in this case based on the damages and pre-judgment interest, as explained below, is about $333.3 million ($236.8 million in damages and $96.5 million in pre-judgment interest). A success fee of 10% reduced by the actual amount of attorneys fees paid to New York counsel for the Petrobras defendants ($10 million), yields a success fee of $23.3 million. (*See* Vickery Decl. Ex. 1, 3.). However, the total amount of the recoverable attorney's fees using the lodestar ($12,895,452) and expenses ($10,853,-579) amounts to $23,749,031. Because the recoverable legal costs cannot exceed $36,730,905, *see supra* ¶ 3, only $12,981,874 of the success fee of $23.3 million is recoverable. The remaining approximately $10,318,126 success fee is not recoverable as part of the judgment against the Sureties. But the fact that a substantial portion of this reasonable success fee is not recoverable underscores that the total amount of fees and expenses that is recov-

erable as part of the Judgment in this case is completely reasonable. Therefore, when the amount of reasonable attorneys' fees and expenses are added to the damages already determined by the Court, the Judgment in this case with respect to both Bonds should be in the total amount of each Bond.

### Pre–Judgment Interest

15. Pre–Judgment Interest is determined under New York Law. (COL ¶¶ 8,49.) N.Y. Gen. Obligation. Law § 7–301 provides for pre-judgment interest in addition to the amount of the Bond. While it provides for interest from the time of default, no damages had accrued at that time and the damages were actually incurred over time as expenditures were made on the P–19 and P–31 projects and as delay damages accrued. When damages accrue over time, New York law provides that "interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single intermediate date." N.Y. C.P.L.R. § 5001(b). This provision has been applied in the context of the liability of a surety. *See, e.g., Tynan Incinerator Co., Inc. v. Int'l Fidelity Ins. Co.*, 117 A.D.2d 796, 499 N.Y.S.2d 118 (N.Y.App.Div.1986). The intermediate date provides a reasonable means of calculating interest without the requirement of calculating interest from a myriad of individual points in time. The Court will exercise its discretion in adopting the means that is provided in the statute for the determination of the reasonable intermediate date by using the chronological midpoint. Hence, for the construction cost damages on each of the projects, prejudgment interest accrues from a date halfway between the date on which the Sureties prejudgment interest obligation arose (July 11, 1997 for the P–19 Bond and August 18, 1997 for the P–31 Bond) and the last date on which the damages were

incurred (April 30, 1998 (FOF ¶ 459) for the P–19 Bond and November 30, 1998 (FOF ¶ 468) for the P–31 Bond). Interest on the delay damages is calculated for each project from the date on which the delay damages began to be incurred (September 21, 1997 (FOF ¶ 463) for the P–19 Bond and May 24, 1998 (FOF ¶ 469) for the P–31 Bond) and the last date on which they were incurred (April 9, 1998 (FOF ¶ 463) for P–19 and November 24, 1998 (FOF ¶ 469) for P–31). The result of these calculations is that as of September 13, 2002, the pre-judgment interest on the P–19 construction cost damages is $24,941,576, and the pre-judgment interest on the P–19 delay damages is $13,809,890 for a total of $38,751,466, and pre-judgment interest accrues for each day until judgment is entered at the rate of $22,339. As of September 13, 2002, the pre-judgment interest on the P–31 construction cost damages is $46,362,932 and the pre-judgment interest on the P–31 delay damages is $10,952,414 for a total of $57,315,346, and pre-judgment interest accrues for each day until judgment is entered at the rate of $36,049. (*See* Pl. Further Objections at 9.)

### *Monetary Judgment in Favor of the Japanese Banks*

16. Both the Petrobras defendants and the Japanese Banks assert that the monetary judgment against the Sureties on the P–19 Bond should run in favor of both Brasoil and the Japanese Banks. The Judgment will so provide. The Japanese Banks sought in their counterclaim not only a declaration of the obligations of the Sureties under the P–19 Bond but also a monetary judgment along with Brasoil. The Japanese Banks were listed as obligees on the Joint Obligee Rider and thus the Sureties owe their obligations to both Brasoil and the Japanese Banks. *See Lasky v. Lissik*, 140 Misc. 826, 251 N.Y.S. 753, 758 (N.Y.Sup.1931) ("any joint obligee may sue for the enforcement of the promise"); *People v. American Surety Co. of New York*, 241 A.D. 199, 272 N.Y.S. 2, 4 (App.Div.1934) (terms of contract govern rights of obligees).

The Court will enter the Judgment accordingly.

**SO ORDERED.**

### *JUDGMENT*

These consolidated actions came on for trial before the Court, Honorable John G. Koeltl, District Judge, presiding, and the issues having been duly tried on various dates from January 22, 2002 through March 21, 2002 and on April 10, 2002, and the Court having issued Findings of Fact and Conclusions of Law, dated July 25, 2002.

It is Ordered, Adjudged and Decreed, that:

1. All claims of plaintiffs United States Fidelity and Guaranty Company and American Home Assurance Company against defendants Braspetro Oil Sevices Company, Petróleo Brasileiro SA—Petrobras, The Bank of Tokyo–Mitsubishi, Ltd. (sued herein as The Bank of Tokyo Ltd.-Japan) and Shinsei Bank Limited (successor in interest to The Long Term Credit Bank of Japan, Ltd.), set forth in plaintiffs' pleadings in these consolidated actions are dismissed on the merits, with prejudice.

2. Defendants Braspetro Oil Services Company, a Cayman Islands corporation, with address at the Anderson Square Building, Second Floor, Georgetown, Cayman Islands, British West Indies, on its First Counterclaim set forth in its Amended Answer, Affirmative Defenses and Counterclaims, dated June 7, 1999, in Case No. 97 Civ. 6124, and The Bank of Tokyo–Mitsubishi, Ltd. (sued herein as The Bank of Tokyo Ltd.-Japan), with address at 7–1 Marunouchi, 2–chome, Chiyoda-ku, Tokyo

100–8388, Japan, and Shinsei Bank Limited (successor in interest to The Long Term Credit Bank of Japan, Ltd.), with address at 1–8 Uchisaiwaicho 2–chome, Chiyoda–Ku, Tokyo 100–8501, Japan, on their respective Counterclaim set forth their Answer and Counterclaim, dated June 1, 1999, in Case No. 97 Civ. 6124, jointly, shall have judgment, recovery and execution against plaintiffs United States Fidelity Guaranty Company, a Maryland corporation, with address at 6225 Smith Avenue, Baltimore, Maryland 21209–3653, U.S.A., and American Home Assurance Company, a New York corporation, with address at 70 Pine Street, New York, New York 10005, U.S.A., jointly and severally, in the sum of Ninety Million, Six Hundred Thousand ($90,600,000) Dollars, plus pre-judgment interest at the rate of 9% per annum, in the amount of Thirty Eight Million, Seven Hundred Fifty One Thousand, Four Hundred Sixty–Six ($38,751,-466) Dollars accrued until September 13, 2002, plus interest per diem, of Twenty Two Thousand, Three Hundred Thirty–Nine ($22,339) Dollars, thereafter until the date of this judgment, in the sum of _____ ($_____) Dollars, plus attorneys' fees and expenses in the sum of Nineteen Million, Nine Hundred Thirty–Two Thousand, Six Hundred Sixty ($19,-932,660) Dollars.

3. Defendant Braspetro Oil Services Company, a Cayman Islands corporation, with address at the Anderson Square Building, Second Floor, Georgetown, Cayman Islands, British West Indies, shall have judgment, recovery and execution on its Second Counterclaim set forth in its Amended Answer, Affirmative Defenses and Counterclaims, dated June 7, 1999, in Case No. 97 Civ. 6124, against plaintiffs United States Fidelity Guaranty Company, a Maryland corporation, with address at 6225 Smith Avenue, Baltimore, Mayland, U.S.A., and American Home Assurance Company, a New York corporation, with

address at 70 Pine Street, New York, New York, U.S.A., jointly and severally, in the sum of One Hundred Forty Six Million, Two Hundred One Thousand, Seven Hundred, Seventy Six ($146,201,776) Dollars, plus pre-judgment interest at the rate of 9% per annum, in the sum of Fifty Seven Million, Three Hundred Fifteen Thousand, Three Hundred Forty Six ($57,315,346) Dollars, accrued until September 13, 2002, plus interest per diem, of Thirty Six Thousand, Forty Nine ($36,049) Dollars, thereafter until the date of this judgment, in the sum of _____ ($_____) Dollars, plus attorneys' fees and expenses in the sum of Sixteen Million, Seven Hundred Ninety Eight Thousand, Two Hundred Forty Five ($16,798,245) Dollars.

**SO ORDERED.**